Annette UTTER, Plaintiff,

v.

UNUM LIFE INSURANCE COMPANY OF AMERICA, et al., Defendants.

No. CV 04–06440FMC.

United States District Court, C.D. California.

Dec. 2, 2005.

Glenn R. Kantor, Tracy A. Collins, Kantor & Kantor, Northridge, CA, for Plaintiff.

Linda M. Lawson, Russell G. Gomm, Meserve Mumper and Hughes, Los Angeles, CA, for Defendants.

## ORDER RE STANDARD OF REVIEW

COOPER, District Judge.

This matter is before the Court on Plaintiff's Motion to Determine Standard of Review and Augment the Record in an ERISA Matter (docket # 19). The Court has reviewed the moving, opposition, reply, and "sur-reply" documents submitted in connection with this Motion. The Court deems this matter appropriate for decision without oral argument. See Fed.R.Civ.P. 78; Local Rule 7–15. Accordingly, the hearing set for December 5, 2005, is removed from the Court's calendar. For the reasons set forth below, the Court grants Plaintiff's Motion to Determine Standard of Review, and denies without prejudice the Motion to Augment the Record.

### I. Background

#### A. Nature of the Case

This action arises out of Plaintiff's claim for long-term disability ("LTD") benefits under a plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001—1461. Plaintiff's claim was initially granted, but benefits were later terminated. Plaintiff's appeal of the termination of benefits was denied by Defendant. Thereafter, Plaintiff filed the present action asserting, *inter alia*, an ERISA claim for benefits.

#### B. Factual Background

Plaintiff seeks LTD benefits under an ERISA policy issued to her employer by Defendant. The Policy names Defendant as the claims fiduciary by conferring an explicit grant of discretionary authority upon it to determine eligibility for benefits:

> When making a benefit determinations under the policy, Unum has discretionary authority to determine ... eligibility for benefits and to interpret the terms and provisions of the policy.

AR 23.

The policy provides for benefits equal to 60% of a participant's salary in the event of disability. The policy defines disability:

> You are disabled when Unum determines that ... you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

AR 27. As is customary in LTD policies, after the first 24 months of payments, the participant must be unable to perform any occupation for which he or she is "reasonably suited by education, training, or experience." AR 45.

Plaintiff filed a claim for benefits on October 10, 2001. The claim and Plaintiff's medical information was subjected to review by Defendant's registered nurse in December 2001. AR 179–80. The nurse noted that Plaintiff appeared to have a long-standing history of peripheral neuropathy with pain, tingling, numbness in both hands and feet. The nurse concluded that the restrictions and limitations recommended by Plaintiff's neurologist doctor were "excessive" and that "the available documents do not support claimant's cognitive impairment."

The nurse also discounted the possibility that the effects of Plaintiff's medications were disabling. She noted that Plaintiff took 1800 mg of Neurontin daily, and had been taking that dosage for twelve months. She noted that Plaintiff had been taking this medication for months before the date of disability. She recommended review by Unum's staff physician.

That review was performed the following day by Debra H. Kile, M.D. AR 181. Dr. Kile noted her concurrence with the R.N. review. She stated that no objective findings supported either physical or cognitive limitations, and that a reasonable restriction would be requiring a 10–15 minute break after 45 minutes of complex mental tasks. This statement was clarified on January 3, 2002, to state that a reasonable restriction would be requiring claimant, after 45 minutes of complex mental tasks, change to a lower-level mental or intellectual task for 10–15 minutes. Dr. Kile also recommended an independent medical examination ("IME") by neurologist.

In January 2002, Plaintiff's claim was approved until March 31, 2002, in order to allow time for an IME. AR 625

In February 2002, Plaintiff submitted to an IME by Dr. Michael E. Gold, M.D., a neurologist. AR 195–98. Dr. Gold diagnosed Plaintiff as suffering from "[m]ild sensory peripheral neuropathy with abnormal peroneal nerve motor conduction velocities ..., painful." He noted that she suffered "cognitive impairments, subjective and possibly secondary to medication," and experienced "recurrent bouts of vertigo of unknown etiology." Nevertheless, he concluded that "there is no objective evidence that the neuropathy today would impair her work as a software engineer." He noted that Plaintiff "complain[ed] of poor concentration, forgetfulness and inability to perform her work as a software engineer," but that she "performed normally

on bedside mental status testing exam." However, he also noted that "there may be subtle cognitive abnormalities not detected by this exam that could be attributed to her current medications" and that "she may experience some distraction secondary to her reported pain."

Dr. Gold recommended neuropsychological testing to "pick up any subtle cognitive changes that she reports that were not detected on bedside mental status examination today."

He also noted that Plaintiff's medications, "Neurontin and amitripyline, can be sedating and it may be possible that these are causing the cognitive impairment that she describes." He concludes that "the neurological deficit ... of her mild neuropathy would not disable her from working[,] absent her cognitive complaints."

Dr. Kile reviewed Dr. Gold's report on March 19, 2002. She noted:

IME does not alter prior OSP [on-site physician] opinion.

Records currently on file remain inadequate to support condition severity and significant physical or cognitive impairment. Condition and/or treatment does not appear to preclude RTW [return to work].

Dr. Kile concurred that a neuropsychological exam was indicated. Dr. Kile's notes do not reflect Dr. Gold's concerns regarding the possible adverse effect of Plaintiff's medications and her pain on her cognitive functioning.

Karen Schlitz, Ph.D., conducted the neuropsychological exam and issued a report dated June 26, 2002. AR 552–62. Dr. Schlitz evaluated Plaintiff's verbal and visual reasoning abilities in the "very superior" range, and her verbal and visual processing abilities in the "high average" to "very superior" range. She noted that

Plaintiff showed no evidence of overall intellectual decline, and that all her cognitive levels were within normal limits. Dr. Schlitz opined that "there is no credible evidence that this patient has any cognitive disabilities or psychological disabilities that would preclude her from working in her current job capacity." Nevertheless, Dr. Schlitz also noted, in the very next sentence of her report, that her opinion must be tempered by an analysis of the possible adverse effect of Plaintiff's medications and her pain on her cognitive functioning:

> However, it should be noted that I cannot comment on her neuropathy and the pain levels as this likely interferes with ability to sustain concentration. Certainly adverse reactions to Neurontin and Amitriptyline should be considered. The literature on Neurontin indicates that a patient can manifest symptoms of anxiety with regards to adverse reactions, with the literature indicating concerning Amitriptyline that adverse reactions may involve disturbed concentration, anxiety, and restlessness in addition to weakness and fatigue.

AR 560. Dr. Schlitz reiterated this disclaimer three additional times in her report.

Dr. Kile reviewed Dr. Schlitz's report on July 12, 2002. AR 260. As a result of this review, and her review of Dr. Gold's February 2002 report, Dr. Kile concluded:

> Neurology IME 2/26/02 and Neuropsychology IME 6/26/02 appear supportive of prior OSP opinions that condition severity is not established. There is inadequate evidence on file to support significant impairment on basis of peripheral neuropathy or cognitive dysfunction. Condition does not appear to preclude RTW.

AR 260. In reaching this conclusion, Dr. Kile very clearly relied on Dr. Schlitz's opinion that Plaintiff had no "cognitive disabilities or psychological disabilities" that would preclude her return to work. *See* AR 260 (quoting Dr. Schlitz's report indicating "no credible evidence [re] cognitive . . . or psychological disabilities"). However, Dr. Kile also very clearly completely ignored Dr. Schlitz's comments regarding the possible adverse effect of Plaintiff's medications and her pain on her cognitive functioning. Nor did Dr. Kile's review take into account Dr. Gold's discussion regarding the "sedating" effect of Plaintiff's medications and the "distract[ing]" effect of Plaintiff's pain on her cognitive functioning.

Unum terminated Plaintiff's benefits as of August 1, 2002, and notified her of that termination in a letter dated August 13, 2002. AR 544.

Plaintiff filed an appeal of that decision on February 21, 2003. AR 476–512. With that appeal, Plaintiff submitted additional medical information from her treating neurologist, letters of commendation for her work performance before her date of disability, a copy of her job description, the medical opinion of Jeffrey Chung, M.D., neurologist, dated December 13, 2002, an opinion by psychologist Richard Steinberg, Ph.D., and vocational report analyzing Utter's work and medical history.

Dr. Rosenberg, Plaintiff's neurologist, in a statement dated June 20, 2002, noted that Plaintiff's disability was continuing and was secondary to a "high dos[age] of antineuropathic pain treatment which appears to compromise her cognitive functions." In a statement dated November 19, 2002, he noted that Plaintiff was still disabled due to "the medications in conjunction with the pain." AR 493–94. As noted in Plaintiff's a vocational report, Dr. Rosenberg described the cognitive impairment caused by Plaintiff's current dosage of Neurontin as the equivalent to that

impairment caused by consuming "six martinis." AR at 483.

Richard Steinberg, Ph.D., a psychologist, examined Plaintiff and concluded that that psychological testing demonstrated a cognitive disorder sufficient to preclude Plaintiff's ability to perform her job duties:

> In sum, with regard to her cognitive abilities, the data cannot discern whether or not there is any permanent cognitive loss, but it clearly indicates that the patient presently cannot perform her work. I would expect her to continue to be unable to perform her work as long as her pain problem and medication situation persists.

AR 511.

On April 30, 2003, Defendant's in-house clinical neuropsychologist Tom McLauren, Ph.D., reviewed the reports of Drs. Schlitz and Steinberg. AR 465. He noted that the two doctors disagreed as to whether the superior intellectual level displayed by Plaintiff demonstrated that her cognitive abilities were impaired. He recommended that Dr. Schlitz be asked to comment on Dr. Steinberg's findings.

Therefore, Unum asked Dr. Schlitz to comment on Dr. Steinberg's report and the vocational report. In a report dated August 20, 2003, she did so. AR 403–08. She continued to assert the opinion that Plaintiff did not demonstrate cognitive dysfunction upon her testing, and she pointed out errors in Dr. Steinberg's interpretation of certain tests performed on Plaintiff. Dr. Schlitz continued to reiterate that she did not, could not, and would not opine as to the extent of the possible adverse effect of Plaintiff's medications and her pain on her cognitive functioning. When asked to "clarify [her] statement that there may be interference with sustained concentration due to pain and medication effects," Dr. Schlitz responded:

> Any subjective changes in attention and concentration can be negatively influenced by the sedative effects of the medication regimen and the pain complaints....
>
> A review of the literature on Neurontin indicates that side effects can include tiredness, sleepiness, dizziness, headache, unsteadiness, double vision, tremor, stomach upset, weight gain, ... irritability and hyperactivity....
>
> A review of the literature on Amitripyline also indicates that sedating effects can be positive along with fatigue. Symptoms of anxiety, compromises in attention and concentration, restlessness, drowsiness, and weakness have also been documented as adverse reactions pertaining to the central nervous system.
>
> The literature on pain also reveals that pain has been shown to interfere with attentional mechanisms as well as memory.... Further studies are needed to clarify the variables that mediate the impact of pain on neuropsychological functioning levels.

AR 406. Twice more in her report, Dr. Schlitz emphasizes that the effects of Plaintiff's pain and medications need to be taken into account in determining whether Plaintiff is disabled. See AR at 407 (noting that "the negative influences of [Plaintiff's] pain and associated medications need to be taken into account with regards to her daily/work functioning"); AR at 408 ("I also stated in that report that I could not comment on ... the influence of her medications ... and her pain levels in negatively affecting her ability to function.")

Just as she was unable to offer such an opinion as a neuropsychologist, Dr. Schlitz stated that Dr. Steinberg, as a psychologist, should not have offered the opinion that Plaintiff was disabled due to the effects of her pain and her medication.

Defendant conducted another in-house medical review on May 13, 2003. AR 430–32. Dr. Alan Neuren, M.D., concluded that Plaintiff's restrictions and limitations were not supported because "the insured has been diagnosed with a condition of unknown cause on the basis of inconclusive testing." ˙ Dr. Neuren's report does not discuss the effect of Plaintiff's pain and Plaintiff's medications on her ability to perform her job duties.

Ultimately, by letter dated November 19, 2003, Defendant notified Plaintiff of the denial of her appeal. AR 330–33. The denial letter outlines in detail some of the medical evidence considered in connection with Plaintiff's claim and her appeal. The letter concludes:

> In summary, the medical data contained in Ms. Utter's file does not demonstrate objective neurocognitive impairment that would preclude her from performing her occupation. The General Medical review found no support of medical restrictions and limitations from a physical standpoint as identified by Ms. Utter's physicians to preclude her from performing the duties of her occupation.
>
> Based on a complete review of Ms. Utter's claim file, we find the denial of disability benefits to be contractually and factually ·supported and we [are] upholding that decision.

AR 333. The denial letter is devoid of any discussion of the possible adverse effect of Plaintiff's pain and her medications on her cognitive functioning.

## II. Standard of Review

■ A plan administrator is presumed to have no discretion to interpret the terms of an ERISA plan; therefore, the administrator bears the burden of showing that the plan unambiguously confers such discretion on the administrator. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir.1999) (en banc), *cert. denied*, 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999). Where that burden is met, the administrator's denial of benefits is reviewed for abuse of discretion under the "arbitrary and capricious" standard of review. *Abatie v. Alta Health & Life Ins. Co.*, 421 F.3d 1053, 1059 (9th Cir.2005); *Kearney*, 175 F.3d at 1088–89.

Nevertheless, even if the burden is met, if the plan administrator is also the insurer, a different standard of review may apply because the plan administrator's fiduciary duty may be affected by financial self interest. *Tremain v. Bell Industries, Inc.*, 196 F.3d 970, 976 (9th Cir.1999). Stated otherwise, where the plan administrator is the insurer, an apparent conflict of interest arises. *Id.*

■ Although this apparent conflict of interest is insufficient to alter the standard of review, where the beneficiary presents "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self interest caused a breach of the administrator's fiduciary obligations to the beneficiary, ... a rebuttable presumption arises in favor of the participant" that the decision to deny benefits will be reviewed under the less rigid *de novo* standard. *Id.* (internal quotation marks and citations omitted).

■ Once the beneficiary raises this presumption, the administrator bears the burden of rebutting it by producing evidence to show that the conflict of interest did not affect its decision to deny or terminate benefits. *Id.* (internal quotation marks and citation omitted). If the plan fails to carry this burden, courts review *de novo* the decision to deny benefits. *Id.* (citations omitted).

■ Here, the policy reserves to Defendant the authority to interpret the provisions of the policy and there is an apparent conflict of interest in Defendant's decision

to terminated benefits. Therefore, if Plaintiff presents "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self interest caused a breach of the administrator's fiduciary obligations to the beneficiary," she will have the benefit of the rebuttable presumption that a *de novo* standard of review applies.

Here, Plaintiff has presented evidence that Defendant failed to consider the possible adverse effect of Plaintiff's medications and her pain on her cognitive functioning in assessing whether she was disabled, and thus entitled to benefits, under the policy. Although, in its exercise of discretion, a claims fiduciary may weigh conflicting medical evidence and determine one medical opinion is more reliable or persuasive,[1]

a claims fiduciary may not turn a blind eye to uncontroverted medical opinions that tend to establish eligibility for benefits.

It is important to note that the concern regarding the possible adverse effect of Plaintiff's pain and her medications is not expressed as a mere passing reference in one medical opinion; rather, the record is replete with examples [2] of discussions by two neurologists, a neuropsychologist, and a psychologist of the possibility that Plaintiff's pain and her medications impair her cognitive functioning. In fact, as detailed above, Dr. Schlitz, the neuropsychologist retained by Defendant to express an opinion regarding Plaintiff's impairment, expressed this concern no fewer than seven times.

---

1. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) (holding that ERISA plan administrators need not automatically accord special weight to the opinions of a treating physician and noting that plan administrators do not bear a special burden of explaining their rationale when crediting reliable evidence that conflicts with a treating physician's evaluation).

2. Specifically, the record contains the following comments and opinions by Plaintiff's doctors and doctors retained by Defendant to conduct IMEs: 1) In February 2002, Dr. Michael E. Gold, M.D., neurologist, stated that Plaintiff "may experience some distraction secondary to her reported pain" and that Plaintiff's medications, "Neurontin and amitripyline, can be sedating and it may be possible that these are causing the cognitive impairment that she describes." 2) In June 2002, Karen Schlitz, Ph.D., neuropsychologist, stated that she could not comment on Plaintiff's pain levels which likely interfered with Plaintiff's ability to sustain concentration. She noted side effects of Plaintiff's medications which included anxiety, disturbed concentration, restlessness, weakness, and fatigue. She reiterated her concern regarding the possible disabling effects of Plaintiff's pain and medications three more times in her report. 3) In June 2002, Dr. Rosenberg, Plaintiff's neurologist, noted that Plaintiff's disabil-

ity was continuing and was secondary to a "high dos[age] of antineuropathic pain treatment which appears to compromise her cognitive functions." 4) In November 2002, Dr. Rosenberg noted that she still disabled due to "the medications in conjunction with the pain." 5) In November 2002, Richard Steinberg, Ph.D., psychologist, offered the opinion that he "would expect [Plaintiff] to continue to be unable to perform her work as long as her pain problem and medication situation persists." 6) In a statement attributed to Dr. Rosenberg in February 2003, it was noted that the cognitive impairment caused by Plaintiff's current dosage of Neurontin was the equivalent to that impairment caused by consuming "six martinis." 7) In August 2003, Dr. Schlitz again stated that she could not opine as to the extent of the effect of Plaintiff's pain and medications on her functional abilities, but noted that Plaintiff's medications are known to have sedative effects and that side effects include anxiety, dizziness, double vision, drowsiness, fatigue, headache, sleepiness, irritability, hyperactivity, restlessness, weakness, and compromises in attention and concentration. She also noted that the literature on pain also reveals that pain has been shown to interfere with attentional mechanisms as well as memory. She reiterated this point twice more.

In stark contrast to the treating and examining doctors' discussions regarding the possible adverse effects of Plaintiff's pain and her medications stands Defendant's complete and utter failure to even acknowledge the possibility that Plaintiff's pain or her medications could impair in any way her ability to perform her job duties. The record is clear that Plaintiff's job required analytical ability, attention to detail, and completion of complex tasks. Yet despite repeated references in the record to the potential adverse effects of Plaintiff's "distract[ing]" pain and "sedating" medications by the treating and examining doctors, a review of Defendant's in-house doctors' reports reveal a wholesale failure to consider this issue. This utter absence of discussion of the possible adverse effect of Plaintiff's pain and medications on her cognitive functioning is most glaring in—but certainly not limited to— Dr. Kile's review of Dr. Schlitz's report in which Dr. Kile quoted verbatim Dr. Schlitz's opinion that there was "no credible evidence [re] cognitive ... or psychological disabilities," but made no mention of *the very next sentence* of Dr. Schlitz's report in which Dr. Schlitz cautioned that

her opinion must be tempered by considerations of the effect of Plaintiff's pain that "likely interferes with ability to sustain concentration." Similarly, Dr. Kile made no mention of Dr. Schlitz's warning regarding the possible debilitating effects of Plaintiff's medications. This failure to even acknowledge this issue is especially egregious in light of the fact that, in the report reviewed by Dr. Kile, Dr. Schlitz cautioned no fewer than *four times* that Plaintiff's pain and her medications must be considered in assessing whether Plaintiff was disabled.

Although the record is replete with instances in which this issue is discussed by treating and examining doctors, conspicuously absent in the record is *any* comment by Defendant's in-house doctors.[3] Specifically, although Defendant had its in-house doctors review Plaintiff's claim no fewer than five times, not one review mentions, even in passing, the concern regarding the possible adverse effect of Plaintiff's pain and her medications on her cognitive functioning: 1) Dr. Kile's March 19, 2002, notes regarding her review of Dr. Gold's report do not reflect Dr. Gold's concerns regarding the possible adverse effect of

---

**3.** Cited to the Court is only one portion of the administrative record in which Defendant acknowledges the potential debilitating effect of Plaintiff's medications. Defendant's nurse reviewed Plaintiff's medication and discounted the possibility that the effects of Plaintiff's medications were disabling on the basis that Plaintiff's use of Neurontin predated Plaintiff's date of disability by several months and because there was an absence of "any objective findings to support Neurontin's affect on claimant's cognition." AR 180. There is no suggestion in the record that Defendant discounted the effect of Neurontin on these bases. Beyond this passing reference in the nurse's notes, the effect of Plaintiff's medications is simply not mentioned by Defendant again.

In any event, Dr. Schlitz's assessment reveals that Plaintiff's cognitive functioning was impaired prior to her date of disability. *See*

AR 553 (symptoms appearing in January 2001: difficulty in describing the steps involved in doing something, difficulty in finding the right word to say, difficulty staying with one idea; symptoms appearing by August 2001: loss of "train of thought", highly distractible, mind "goes blank", forgetfulness). Moreover, although there may be no "objective findings" to support the effect of Neurontin's effect on Plaintiff's cognitive abilities, the record is filled with warnings by neurologists and a neuropsychologist that such effects need to be considered. The need to provide "objective findings" of that effect was never communicated to Plaintiff. *Cf. Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir.1997) ("If the plan is unable to make a rational decision on the basis of the materials submitted by the claimant, it must explain what else it needs.").

Plaintiff's pain and her medications on her cognitive functioning; 2) as noted above, Dr. Kile's July 12, 2002, review of Dr. Schlitz's report ignored Dr. Schlitz's comments regarding the possible adverse effect of Plaintiff's pain and her medications on her cognitive functioning; 3) Dr. Kile's July 12, 2002, review also relied upon Dr. Gold's report, but failed to discuss the "sedating" effect of Plaintiff's medications and the "distract[ing]" effect of Plaintiff's pain on her cognitive functioning; 4) Dr. McLauren's report regarding his review of the reports of Drs. Schlitz and Steinberg likewise did not comment the possible adverse effect of Plaintiff's pain and her medications on her cognitive functioning; 5) Dr. Neuren's report does not discuss the possible adverse effect of Plaintiff's pain and her medications on her cognitive functioning.

Here, the record reveals that Plaintiff's treating doctors and Defendant's examining doctors both repeatedly expressed concern that Plaintiff's pain and medications could impair her cognitive functioning. In contrast, the record also reveals that Defendant's reviewing doctors simply glossed over those portions of the medical evidence, preferring to concentrate on the evidence that supported a finding that Plaintiff was not disabled. This is not a matter where the reviewing doctors simply found some medical evidence more credible or more persuasive; rather, it is clear from the record that the reviewing doctors wilfully ignored evidence favorable to the Plaintiff and "cherry-picked" evidence that supported a denial of benefits. *Cf. God-frey v. BellSouth Telecommunications, Inc.,* 89 F.3d 755, 759 (11th Cir.1996) ("It seems to the court that the only rational explanation for the failure of the defendant's physicians to follow up on evidence which they did have and to ignore the effects of the medications that the plaintiff was taking is that they knew that in fact the plaintiff was disabled and following up

leads and considering the effect of the medications would only confirm what any reasonable doctor would have already known.") Defendant's role as a claims fiduciary is wholly inconsistent with the actions of its medical reviewers turning a blind eye to evidence that favors an award of benefits.

In light of Defendant's demonstrated failure to consider a significant medical issue that could result in a finding in favor of an award of benefits, Plaintiff has presented "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self interest caused a breach of the administrator's fiduciary obligations." Accordingly, a rebuttable presumption has arisen in favor of Plaintiff that the decision to deny benefits will be reviewed under the *de novo* standard. Because Defendant has failed to rebut this presumption, the Court, upon administrative review, will apply the *de novo* standard of review.

### III. Motion to Augment the Record

 Plaintiff requests that the Court consider seven exhibits that are not part of the administrative record. In determining what standard of review should apply, the Court may consider evidence outside the administrative record. *Tremain v. Bell Industries, Inc.,* 196 F.3d 970, 976–77 (9th Cir.1999). Exhibits 1 through 3 are Plaintiff's recent medical records. Exhibits 4—7 are documents relating to Defendant's conduct in reviewing claims other than Plaintiff's claim. The Court did not find it necessary to consider these documents in arriving at its decision regarding the proper standard of review. Accordingly, the Court denies Plaintiff's Motion to Augment Record without prejudice.

### IV. Conclusion

As set forth above, the Court grants Plaintiff's Motion to Determine Standard

of Review, and denies without prejudice the Motion to Augment the Record.

The clerk shall file the previously lodged administrative record (two volumes).